**Andrew BLAKE, Defendant Below–Appellant,**

v.

**STATE of Delaware, Plaintiff Below–Appellee.**

No. 640, 2007.

Supreme Court of Delaware.

Submitted: April 10, 2008.
Decided: June 24, 2008.

---

13. *Chavin,* 243 A.2d at 696.

Bernard J. O'Donnell, Esquire, of the Office of the Public Defender, Wilmington, Delaware for appellant.

Paul R. Wallace, Esquire, of the Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, BERGER, and RIDGELY, Justices.

RIDGELY, Justice.

Defendant–Appellant Andrew Blake appeals his convictions, following a Superior Court bench trial, of aggravated menacing and various controlled substance and weapons offenses. His sole contention on appeal is that the trial judge erred in denying his motion to suppress evidence obtained after a warrantless entry of an apartment. We conclude that exigent circumstances justified the entry under the emergency doctrine exception to the Fourth Amendment. Accordingly, we affirm.

## I.

New York Police Department ("NYPD") detectives, accompanied by a Wilmington Police Department detective and uniformed officer, responded at about noon to Apartment No. 5 on the second floor of an apartment building in Wilmington, Delaware. Wilmington officers had information that an individual known to them as "Quest" (Blake) resided there. The NYPD detectives were seeking Quest because he had been identified by witnesses as the shooter in an incident on New Year's Eve in Manhattan where three people were shot and wounded.

Several officers went to the front door of the apartment while others covered the outside of the building. The officers at the door knocked and identified themselves as

police officers. They could hear movement inside the apartment, and a baby's crying that seemed to be muffled. No one responded to the door as officers continued to knock over a twenty to thirty minute period. The Wilmington detective and an NYPD detective left to get a search warrant.

While the officers were on their way to apply for a search warrant, one of the NYPD detectives saw an individual in the apartment, later identified as Blake, raise the window screen in one of the windows. Blake pointed a handgun at him and challenged the officers to shoot him. The detective relayed by cell phone to the officers at the front door of the apartment that the person inside had a gun. The detectives who had left to get a search warrant were called back to the scene. The NYPD detective outside saw Blake crash through the window and attempt to escape. He ran about two blocks before police apprehended him.

Meanwhile, the officers at the door heard the muffled crying of a baby in the apartment during the incident. The NYPD detective at the front door testified that after he heard a crash like a window breaking, he heard a sound like a "boom" and then the baby's crying turn into "blood curdling" screaming. The detective also heard a foot pursuit over the Wilmington officer's radio. The detective testified that the officers at the front door were concerned for the infant's safety, forced open the door, and entered the apartment. They found the infant on the floor. The officers also performed a safety sweep of the apartment and saw what appeared to be a small amount of crack cocaine and other drug paraphernalia on the floor near the infant.

After Blake was arrested and the apartment secured, the officers left and obtained a search warrant. Part of the application for the warrant included what the officers had seen in plain view when they performed the safety sweep of the apartment. When the officers executed the warrant, they found a handgun hidden in a toilet tank and additional controlled substances and paraphernalia in the apartment.

Blake was charged with possession of a deadly weapon by a person prohibited, possession of a firearm during the commission of a felony, aggravated menacing, and additional controlled substance offenses. Prior to trial, he moved to suppress the evidence found in the apartment as having been unlawfully seized. The trial judge applied the three factor test this Court adopted for analyzing a warrantless entry in *Guererri v. State*[1] and found that each of the prongs were satisfied and thus an emergency entry was permitted. After the trial judge denied his motion, the State and the defendant agreed to a non-jury trial on only five counts of the indictment. The trial judge convicted Blake on all of the remaining charges, sentenced him, and this appeal followed.

## II.

■ On appeal, Blake argues that the trial judge misapplied the factors in *Guererri*. The showing required to establish the legality of a warrantless search under the emergency doctrine creates a mixed question of law and fact, and we have articulated our standard of review as follows:

> Findings of historical fact are subject to the deferential "clearly erroneous" standard of review. This deferential standard applies not only to historical facts that are based upon credibility determinations but also to findings of historical fact that are based on physical or docu-

---

1. 922 A.2d 403 (Del.2007).

mentary evidence or inferences from other facts. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. Once the historical facts are established, the issue is whether an undisputed rule of law is or is not violated. Accordingly, appellate courts review *de novo* whether there is probable cause for an arrest, as a matter of law.[2]

In *Guererri*, we explained that for the State to establish the legality of a warrantless search under the emergency doctrine, it must prove by a preponderance of the evidence: "(1) [t]he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property[;] (2)[t]he search must not be primarily motivated by intent to arrest and seize evidence[; and] (3)[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." [3]

■ In finding the first prong satisfied, the trial judge noted that the police "were at this apartment for quite some period of time" and despite knocking and announcing their presence, were unable to get the occupant to open the door. The trial judge also accepted the testimony of the detective who testified that he heard muffled baby crying and footsteps approach and back away from the door in response to the knocking. He credited the detective's recollection of the events that he heard "a window crashing, the radio calls that a foot chase was pursuing, that it was Mr. Blake that was being pursued, and

then he heard a boom, and the baby's muffled cries became something, as he described it, 'blood curdling,' a significant and quantitatively and qualitatively different kind of crying in the Court's view and in his view, which raised a question in his mind about whether there was an emergency in the apartment." The trial judge found that the detective had reasonable grounds to believe that he had to go in and check on the baby. Although Blake argues that a "screaming baby is not an emergency [and] indicates ... that a baby is alive and usually healthy, even if uncomfortable," the trial judge's credibility determinations are entitled to deference. These conclusions are not clearly erroneous.

■ In finding the second prong satisfied, the trial judge accepted the detective's testimony that the entry was prompted in response to the "blood-curdling screams from a baby" and not primarily motivated by an attempt to arrest or seize evidence. As explained in *Guererri*, "[u]nder the second prong of the emergency doctrine test, officers must conduct the search primarily to achieve a community caretaking function, rather than to pursue a law enforcement objective." [4] Here, the officer directed his community caretaking function at protecting the welfare of the individual baby whose screams went from ordinary to "blood-curdling" following Blake's exit from the apartment. Again, the trial judge's acceptance of the officer's reasoning is a credibility determination entitled to deference.

■ The trial judge next found the third prong of *Guererri* satisfied. The emer-

---

**2.** *Id.* at 406 (quoting *Lopez v. State,* 861 A.2d 1245, 1248–49 (Del.2004)) (internal quotation marks omitted).

**3.** *Id.*

**4.** *Id.* at 407 (citing *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706

(1973) and *Virginia v. Waters,* 20 Va.App. 285, 456 S.E.2d 527, 530 (1995)). The phrase "community caretaking" derives from *Dombrowski,* 413 U.S. at 441, 93 S.Ct. 2523:

Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability

gency, as defined as the trial judge as "responding to the baby with the bloodcurdling yell," required the detective to go inside the apartment because the officer knew the baby was near the door. Given the timing of the boom which took place after Blake had "bailed out the window," the trial judge found that these circumstances approximated proximate cause to associate the emergency with the apartment that was searched. To satisfy this prong, "there must be a direct relationship between the area to be searched and the emergency. Thus, the search may include not only a search of the premises to find people in need of aid, but also a protective sweep to ensure that no further danger is present."[5] That is exactly what happened here, and the trial judge did not err in finding the third prong satisfied.

### III.

Only under certain limited circumstances are police justified "in making a warrantless entry and conducting a search of the premises to provide aid to people or property."[6] One of those circumstances is the emergency doctrine exception, which does not violate the Fourth Amendment if the three-pronged test of *Guererri* is satisfied. We conclude that the trial judge

and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.
*See also Guererri*, 922 A.2d at 407:
The facts here do not fairly suggest a motivation to apprehend and arrest Guererri or to seize evidence. The officers were not acting with law enforcement motivations; when they began their search, they had no reason to believe any crime had been committed or was being committed by Guererri in his home. The record is consistent with a good faith effort to aid potential victims of shotgun fire and with the officers' primary concern for health and safety of any people that might be found in Guererri's house.

properly applied the emergency doctrine to the circumstances of this case and did not err in denying Blake's motion to suppress.[7]

The judgment of the Superior Court is **AFFIRMED.**

**5.** *Id.* (citations and internal quotation marks omitted).

**6.** *Id.* at 406.

**7.** The trial judge also held that, in the alternative, the motion would be denied because Blake lost his standing to challenge the search when he jumped out the window. In its brief, the State notes that its argument rests on the assumption that "Blake had standing to complain of any illegal search or seizure from the apartment." Because we find *Guererri* was properly applied and the State does not challenge Blake's standing, we need not address this alternate holding.